UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

EDWARD MADERA,

      Plaintiff,                CASE NO.:  6:15-cv-402-Orl-40DAB

v.

BIMBO FOODS BAKERIES
DISTRIBUTION, LLC,  a Delaware
limited liability company, f/k/a/ BIMBO
FOODS BAKERIES DISTRIBUTION, INC.
and BIMBO FOODS BAKERIES
DISTRIBUTION, INC.,

      Defendants.

_____/

## FIRST AMENDED COMPLAINT AND REQUEST FOR JURY TRIAL

COMES NOW the Plaintiff, Edward Madera ("Madera" or "Distributor"), by and through his undersigned attorney, and files this First Amended Complaint and request for jury trial against Defendants, Bimbo Foods Bakeries Distribution, LLC, a Delaware limited liability company f/k/a Bimbo Foods Bakeries Distribution, Inc. ("BFBD, LLC") and Bimbo Foods Bakeries Distribution, Inc., ("BFBD, Inc.") (BFBD, LLC and BFBD, Inc. may hereinafter be collectively referred to as "BFBD") and alleges as follows.

### Jurisdiction

1.      This is an action for an injunctive relief and damages in excess of $15,000.00.

### Parties

2.      Plaintiff, Edward Madera, is a resident of Apopka, Florida.

3.      Defendant, Bimbo Foods Bakeries Distribution, LLC, is a Delaware limited liability company which is registered to do and is doing business in Florida.

4.      Defendant, Bimbo Foods Bakeries Distribution, Inc., is a Delaware corporation with its headquarters and principal place of business in Horsham, Pennsylvania. Until approximately 2009, BFBD, Inc. was known as George Weston Bakeries Distribution, Inc.

5.      Defendant, Bimbo Foods Bakeries Distribution, Inc., operates throughout the United States, including the State of Florida and this judicial district, and distributes its products to grocery stores and other retailers through what it terms "Independent Operators." Each "Independent Operator" has purchased his or her distribution route which gives them the right to deliver BFBD, LLC's or BFBD, Inc.'s products to the retailers within the geographical areas contained within the distribution route.

## Venue

6.      Venue was originally proper in Seminole County, Florida and venue is now proper within the Orlando Division of the United States District Court for the Middle District of Florida.

## General Allegations

7.      On or about May 13, 2002, BFBD's predecessor, George Weston Bakeries Distribution, Inc., ("GWBD") and Madera entered into a Distribution Agreement ("Agreement"). A copy of the Agreement is attached to this First Amended Complaint as Exhibit "1". The initial Complaint in this action referred to and had attached to it another Independent Distributor Agreement dated December 13, 2001, that was also between BFBD's predecessor, George Weston Bakeries Distribution, Inc., ("GWBD") and Madera.

8.      The Agreement sets forth the terms of the independent distribution business and the territory ("distribution business") that Madera owns and operates for his benefit and for the benefit of BFBD.

9. Pursuant to the Agreement, BFBD has developed and or acquired the exclusive distribution rights to distribute and sell various fresh baked products throughout much of the United States.

10. Pursuant to the Agreement, Madera has purchased the Distribution Rights in the Sales Area specifically identified in Schedule "A" attached to the Agreement and BFBD recognizes Madera's ownership of the Distribution Rights and the Agreement expressly states that Madera has the ability and experience necessary to sell and distribute BFBD's products within a specific geographic area.

11. The territory that Madera owns is Sales Area # 13 and the specific territory of Madera's distribution business is set forth on Schedule "A" attached to the Agreement.

12. Madera paid approximately $75,000.00 for his distribution business when he purchased it initially in 2001.

13. When Madera purchased his distribution business in 2001, the average weekly gross sales revenue was approximately between $500.00 and $700.00.

14. Madera has steadily grown his distribution business during the last fourteen (14) years that he has owned and operated it such that the average weekly gross sales revenue is approximately $17,000.00 currently.

15. This $17,000 average weekly gross sales revenue figure for Madera's distribution business is derived from a 2014 IRS Form 1099 – MISC for tax reporting that BFBD, Inc. issued to Madera in January 2015, which states that Madera's nonemployee compensation for 2014 totaled $883,291.05. A copy of the 1099 is attached to this First Amended Complaint as Exhibit "2".

16.     When $883,291.05 is divided by fifty-two (52) weeks in calendar year 2014, the average weekly gross sales revenue of Madera's distribution business is $16,986.37.

17.     The net amount paid by BFBD, Inc. to Madera in 2014 for operating his distribution business according to BFBD, Inc.'s I/O Year End Summary Detail Report dated December 30, 2014, was $98,479.29.  A copy of the Report is attached to this First Amended Complaint as Exhibit "3".

18.     Madera does not know why BFBD, Inc. issued to him a Form 1099 for 2014 stating that his nonemployee compensation for 2014 totaled $883,291.05 when BFBD, Inc. and BFBD, LLC know that the net amount paid by BFBD, Inc. to Madera in 2014 for operating his distribution business according to BFBD, Inc.'s I/O Year End Summary Detail Report dated December 30, 2014, was $98,479.29.

19.     Madera estimates that the current market value for the sale of his distribution business, based on the average weekly gross sales revenue of his route ($17,000.00) times a multiplier of twenty (20) is $340,000.00.

20.     Madera is currently age 42 and he intended to continue to own, operate and grow his distribution business for several more years and to continue to make a comfortable income and living from owning and operating the business in order to support himself and his family.

21.     Pursuant to Article 2.3 of the Agreement, Madera is an independent contractor and not an employee of BFBD.

22.     Article 4.1 of the Agreement sets forth the obligations of Madera as follows.

**ARTICLE 4**
**DISTRIBUTOR'S OBLIGATIONS**

**§4.1   RESULTS:**     In order to maximize its purchases from GWBD, DISTRIBUTOR agrees to develop and maximize sales of Products to Outlets within the Sales Area by maintaining an adequate and fresh supply

of Products in all Outlets; rotating Products to promote their sale before they become stale or off code; promptly removing all stale or off code Products; cooperating with GWBD or its affiliates in its marketing programs, maintaining a computer assisted record-keeping system compatible with the system maintained by GWBD now or in the future; and providing service on a basis consistent with good industry practice to all Outlets requesting service in the Sales Area.  DISTRIBUTOR is not required to service any Outlet that has proven consistently to be unprofitable, provided that where a Chain requires that such an Outlet be served as a condition for serving its other outlets, the profitability of any Outlet which is part of that Chain shall be judged on the profitability of the Chain as a whole. Nothing herein shall be deemed to prohibit DISTRIBUTOR'S right to carry or distribute merchandise for other companies or otherwise engage in any other business activity unless and except to the extent that such other merchandise is competitive with or could contaminate the Products or such other business activity is inconsistent or interferes with the obligations of the DISTRIBUTOR hereunder.

23.     Article 8 and specifically subparts §8.1, §8.2, and §8.3 of the Agreement set forth the termination provisions of the Agreement as follows.

### <u>ARTICLE 8</u>
### <u>TERMINATION</u>

**§8.1**   **<u>BREACH</u>:**  Except as set forth in this Article or upon the sale or transfer of all of the DISTRBUTOR'S Distribution Rights, this Agreement shall not be terminated or canceled provided DISTRIBUTOR carries out the terms hereof.  In the event of DISTRIBUTOR'S breach of any obligations or covenants under this or any other Agreement with GWBD, GWBD may terminate the Agreement as set forth below.

**§8.2**   **<u>NON-CURABLE BREACH</u>:**  If the breach by DISTRIBUTOR involves criminal activity or fraud, threatens public health or safety, or threatens to do significant harm to GWBD, its affiliates, its operations, its trademarks or commercial reputation, GWBD may terminate this Agreement immediately upon written notice and DISTRIBUTOR shall have no right to cure.

**§8.3**   **<u>CURABLE BREACH</u>:**  In the event of breach by DISTRIBUTOR other than under §8.2, GWBD shall give DISTRIBUTOR three (3) business days written notice within which DISTRIBUTOR may cure the breach.  If DISTRIBUTOR fails to cure such breach within said three (3) day period, GWBD may thereafter terminate this Agreement and DISTRIBUTOR shall have no further right to cure; provided, further, that the parties agree

that repeated violations constitute a chronic breach and threaten significant harm to GWBD, its operations, its trademark or commercial reputation, and in such event GWBD shall be entitled to terminate this Agreement pursuant to §8.2 and DISTRBITUOR shall have no further right to cure.

24.     In November 2013, BFBD's Sales Representative, James Fallacaro, ("Fallacaro") approached Madera and requested that he sell one of the Publix grocery stores that is located on Hunt Club Road (Publix store #227), which is within Madera's territory, back to BFBD so that BFBD could create a new territory with that store in the new territory.

25.     Based on Madera's information and belief, Fallacaro, London and BFBD have a current initiative underway to create new territories and new distribution businesses in Central Florida from stores in the existing territories and in the existing distribution businesses like Madera and some of the other Distributors who have grown their distribution businesses to their current size.

26.     Madera's distribution business is in the top ten in terms of average weekly gross sales of all of the Distributors that pick up BFBD's products and that Distribute BFBD's products from the BFBD Sanford, Florida distribution warehouse and Madera is a long term Distributor affiliated with BFBD.

27.     The Publix grocery store that Fallacaro told Madera that BFBD wanted to buy back and to remove from his territory and distribution business is within the geographic territory that Madera owns exclusive contractual distribution rights to under Schedule "A" of the Agreement.

28.     The Publix grocery store that Fallacaro told Madera that BFBD wanted to buy back and to remove from Madera's distribution business is one of the most lucrative stops of the four (4) stores within his territory as that store averages approximately $6,000.00 in weekly gross sales revenue.

29.     Madera told Fallacaro that he would not sell the Publix grocery store back to BFBD so that BFBD could take the Publix grocery store out of his territory and away from his distribution business.

30.     When Madera rejected Fallacaro's request and offer to buy back the Publix grocery store from his territory and his distribution business, Fallacaro as well as London became agitated and angry toward Madera.

31.     BFBD's distribution warehouse in Sanford, Florida is under the supervision of John London ("London") who is known for his aggressive and competitive management style and for using bullying type tactics against Distributors like Madera in order to get his way.

32.     An illustration of London's aggressive and competitive management style and his bullying type tactics against Distributors like Madera in order to get his way are statements made by London to Madera and other Distributors that "he never loses".

33.     After Madera refused to allow BFBD to buy back and to take the Publix grocery store out of his territory and away from his distribution business, London, Fallacaro, and another BFBD representative, Paul Kopeck, began issuing notice of breach of distribution agreement letters to Madera under the curable breach provision of the Agreement.

34.     The various notice of breach of distribution agreement letters that BFBD's representatives issued to Madera did not comport with the terms of the Agreement including that: 1) some of the letters were unsigned by the BFBD representatives who purportedly issued the letters; and, 2) some of the letters were purportedly hand delivered to Madera which is inconsistent with the Notice provision set forth in paragraph 11.1 of the Agreement which requires delivery by an overnight courier service or mail delivery of all notices.

35.     BFBD does not have proof that any of the notice of breach of distribution agreement letters that were purportedly issued to Madera were in fact received by him.

36.     The notice of breach of distribution agreement letters that BFBD's representatives began issuing to Madera after he refused to allow BFBD to buy back and take a Publix grocery store out of his territory and from his distribution business were issued in furtherance of London, Fallacaro and BFBD documenting Madera's alleged service failures which would then lead to BFBD's eventual termination of Madera's Agreement.

37.     When Madera refused Fallacaro's request to sell back to BFBD and give up a Publix grocery store from his territory and from his distribution business, London and Fallacaro began documenting, and he (London) directed BFBD's representatives under his supervision to begin documenting, Madera's alleged service failures in order to eventually terminate Madera's Agreement so that BFBD could re-take control of Madera's distribution business and re-acquire the stores in his territory for new territories and distribution business and to sell to new Distributors.

38.     BFBD sells distribution rights to other Distributors like Madera so that they can own and operate a distribution business affiliated with BFBD and BFBD also has a relationship with a lender that provides loans to Distributors who need to borrow money in order to purchase and own a territory to distribute BFBD's products.

39.     When Madera was issued BFBD's notice of breach of distribution agreement letters that he in fact received, Madera always took the necessary steps to address the issues and concerns that were set forth in the letters and to cure the alleged breaches.

40.     When Madera took the necessary steps to address the issues and concerns that were set forth in the letters that he in fact received and to cure the alleged breaches, Madera

believed that the alleged breaches were thereby cured under paragraph 8.3, the Curable Breach provision of the Agreement, and that the alleged breach would not thereafter be used against him again in order to terminate his Agreement.

41.     On Tuesday, January 20, 2015, BFBD, via its Sales Representative, John London, issued a written notice of termination ("Termination Notice") of Madera's Distribution Agreement for alleged continuing service alleged failures, numerous out of stock conditions of some of the best selling BFBD products, alleged failure to participate in marketing programs of BFBD and for alleged failure to return equipment BFBD entrusted to him.   A copy of the Termination Notice is attached to this First Amended Complaint as Exhibit "4".

42.     BFBD's Termination Notice terminated Madera's Distribution Agreement effective immediately; as of January 20, 2015.

43.     BFBD's Termination Notice cited Madera for alleged service failures and alleged out of stock condition in two stores in Madera's territory on Wednesday, January 7, 2015, which was thirteen (13) days prior to the date of the Termination Notice and which is one of the two weekdays that BFBD's distribution warehouse is closed and which is one of the two weekdays that the Distributors only do "pull ups" of their inventory stored in the back of their stores rather than to make deliveries from the BFBD distribution warehouse in Sanford, Florida to their stores.

44.     By finding and citing Madera for alleged service failures and out of stock conditions in two stores in Madera's territory on Wednesday, January 7, 2015, London was more likely to find those conditions on those days than on other weekdays when Madera makes deliveries to his stores and re-stocks the store shelves with BFBD's products that he had picked up from the BFBD depot in Sanford, Florida for delivery that day.

45.     Madera is responsible for ordering in advance the items and the quantities of the BFBD's products, which exceed over 100 items of products, for delivery to each of the stores in his territory, so that the store shelves have fresh products and enough of the products for the customers of the stores to purchase.

46.     Even though Madera is responsible for ordering in advance the items and the quantities of the BFBD's products, Madera also cannot over order BFBD's products to deliver to the stores in his territory so that none of BFBD's products in the stores are out of stock as that results in returns back to the BFBD distribution warehouse in Sanford which causes waste and lost profits to BFBD.

47.     Some of the out of stock conditions that Madera was cited for in BFBD's Termination Notice were for products that that particular store (Winn Dixie) does not order or sell that BFBD supplies.

48.     The failure to participate in marketing programs of BFBD that Madera was cited for in BFBD's Termination Notice was raised by BFBD's Sales Representative, James Fallacaro, in a notice of breach of distribution agreement letter that was issued to Madera dated December 11, 2014, and that Madera timely cured pursuant to paragraph 8.3, the Curable Breach, provision of the Agreement. Had Madera not cured that alleged breach, BFBD could have taken appropriate action at that time to terminate the Agreement for Madera's failure to timely or properly cure the alleged breach.  A copy of this previous letter is attached to this First Amended Complaint as Exhibit "5".

49.     The failure to return BFBD equipment entrusted to him that Madera was cited for in BFBD's Termination Notice was raised by BFBD's Sales Representative, James Fallacaro, in a notice of breach of distribution agreement letter that was issued to Madera dated January 11,

2014, and that Madera timely cured pursuant to paragraph 8.3, the Curable Breach, provision of the Agreement.  Had Madera not cured that alleged breach, BFBD could have taken appropriate action at that time to terminate the Agreement for Madera's failure to timely or properly cure the alleged breach.  A copy of this previous letter is attached to this First Amended Complaint as Exhibit "6".

50.     BFBD's Termination Notice issued to Madera, advised Madera that he and his employees and/or representatives were not permitted on the premises of BFBD or of any company related to BFBD without the prior express approval of a representative of BFBD.

51.     BFBD's Termination Notice issued to Madera, advised Madera that if he or his employees and/or representatives are seen on its premises without permission, that BFBD would consider their presence a trespass.

52.     BFBD's Termination Notice issued to Madera, advised Madera that he has 90 days to sell his distribution rights to a qualified purchaser approved by BFBD according to his Distribution Agreement.

53.     BFBD's Termination Notice issued to Madera, advised Madera that if he wished to have BFBD market his rights for the sale of his distribution business prior to the expiration of the 90-day period to sell his business, to please notify the company.

54.     BFBD's Termination Notice issued to Madera, advised Madera that under the terms of his Distribution Agreement, that BFBD will, within the limits of its ability to do so, operate his business for his account until the sale is completed.

55.     BFBD's Termination Notice issued to Madera, advised Madera that the expenses associated with the operation of his business and all other amounts due to BFBD will be

deducted from his company's weekly settlement and the proceeds of the sale of his distribution rights.

56.     BFBD's Termination Notice issued to Madera, advised Madera that if he failed to secure a qualified buyer after 90 days have passed, BFBD will market and sell his rights for his account.

57.     On February 9, 2015, London issued an amended notice of termination of distribution agreement ("Second Termination Notice") in which he stated that BFBD's first Termination Notice contained an inadvertent misstatement regarding the time period during which Madera had the right to market and sell his distribution rights and that Madera only had 30 days from his date of termination on January 20, 2015, to market and sell his distribution business to a qualified purchaser.  A copy of the Second Termination Notice is attached to this First Amended Complaint as Exhibit "7".

58.     London's Second Termination Notice to Madera gave Madera a new ultimatum that he had to sell his distribution business with 30 days from his date of termination on January 20, 2015, rather than the original 90 days that BFBD gave Madera in which to sell his business.

59.     London's Second Termination Notice to Madera meant that Madera had to find a buyer for his business in approximately eleven (11) calendar days from the date of the second Termination Notice.

60.     BFBD's attempted termination of Madera's Agreement based upon Madera's alleged service failures, alleged numerous out of stock of some of the bestselling BFBD products, alleged failure to participate in BFBD marketing programs and alleged failure to return BFBD's equipment are all pretexual reasons for BFBD to terminate Madera's Agreement so that

BFBD could re-take control of Madera's territory and his distribution business and re-acquire the stores in his territory for new distribution business and to sell to new Distributors.

61.     The alleged service failures and out of stock conditions that Madera is being cited for in BFBD's Termination Notice are caused by London and BFBD's own internal policies and programs of reducing the amount of returns ("returns") of unsold or stale products that Madera and the other Distributors are held accountable for and admonished for bringing back to the BFBD distribution warehouse in Sanford, Florida and for which BFBD gives full credit back to Madera and the other Distributors.

62.     In 2014, the BFBD distribution warehouse in Sanford had an internal goal of the Distributors' returns not exceeding 10% - 11%.  Madera's returns in 2014 were approximately 9%.

63.     In 2015, the BFBD distribution warehouse in Sanford has an internal goal of the Distributors' returns not exceeding 5% - 6%.

64.     One of the basic purposes and part of the scope of BFBD's District Sales Manager position is to be directly responsible for the profitable achievement of the district's sales volume goal, both in terms of dollars, units and returns.

65.     One of the principal accountabilities of BFBD's District Sales Manager position is a focused effort on the reduction of the Distributor's returns while maintaining volume growth.

66.     One of the position requirements of BFBD's District Sales Manager position is to be responsible for searching out waste within the depot of responsibility and creating an action place to address and remove the amount of waste.

67.     BFBD, by and through London and its other management and sales representatives, targeted stores in Madera's territory for reacquisition and he refused to acquiesce as was his contractual right under his Agreement with BFBD.

68.     Following BFBD's termination of Madera's Agreement effective as of January 20, 2015, BFBD took over operating his territory and distribution business with Madera's former employee, Frank Schwarz, for his account and BFBD charged Madera for its expenses associated with the operation of his business and all other amounts due to BFBD which were deducted from Madera's weekly settlement that he was being paid by BFBD.

69.     When Madera's initial Complaint was filed on or February 27, 2015, Madera had been terminated from his territory and his distribution business with BFBD for approximately five (5) weeks and BFBD had paid Madera the net proceeds from operating his business for his account after deducting its expenses associated with the operation of his business from his weekly settlement that he is being paid by BFBD.

70.     For the first week following BFBD's termination of Madera's Agreement, which was for settlement period ending January 24, 2015, BFBD paid Madera $1,016.62 as the net proceeds from operating his territory and distribution business.

71.     For the second week following BFBD's termination of Madera's Agreement, which was for settlement period ending January 31, 2015, BFBD paid Madera $740.23 as the net proceeds from operating his territory and distribution business.

72.     For the third week following BFBD's termination of Madera's Agreement, which was for settlement period ending February 7, 2015, BFBD paid Madera $86.70 as the net proceeds from operating his territory and distribution business.

73.     For the fourth week following BFBD's termination of Madera's Agreement, which was for settlement period ending February 14, 2015, BFBD paid Madera $4,007.45 as the net proceeds from operating his territory and distribution business.

74.     For the fifth through the eight weeks following BFBD's termination of Madera's Agreement, which were for settlement periods ending February 21, February 28, March 7 and March 14, 2015, BFBD paid Madera $0.00 as the net proceeds from operating his territory and distribution business.

75.     Madera was very concerned that BFBD's re-taking and operating of his territory and distribution business was destroying the business that he had worked long and hard on building to the size that it was before BFBD, by and through London, decided to wrongfully terminate his Agreement in order to take his territory back to BFBD so that BFBD could create a new territory to sell.

76.     Following BFBD's termination of Madera's Agreement, BFBD indicated that it is interested in purchasing Madera's territory and his distribution business from him and BFBD offered low ball re-purchase offers to him of $176,000.00, $193,000.00, $205,000.00 and $212,000.00 to purchase the territory and distribution business from Madera.

77.     When making the above referenced offers to Madera, BFBD had only valued the average weekly net sales figure of Madera's territory and distribution business to be $12,096.00 on grounds that the nonemployee compensation figure of $883,291.05 on the Form 1099 that BFBD, Inc. issued to Madera for 2014 is over by $270,000.00 due to the difference between BFBD's invoices for sales versus BFBD's scan track promotional pricing.

78.     Madera's Agreement with BFBD sets forth no details whatsoever as to how he is specifically paid for operating his distribution business or BFBD's scan track promotional pricing.

79.     Madera wanted to continue to own and operate his distribution business that he has an Agreement with BFBD to own and operate and from which he has made a living during the last fourteen (14) years in order to support himself and his family.

80.     Madera refused to be forced by BFBD to sell his distribution business to the company or to any other third party as he has worked long and hard on building his territory and his distribution business that BFBD wrongfully took from him by terminating his Agreement with BFBD thereby taking away his livelihood as well as his business.

81.     Under paragraph 11.8, the Controlling Law provision of Madera's Agreement, the validity, interpretation and performance of this Agreement shall be controlled by and construed in accordance with the laws of the State of New York.

82.     All conditions precedent to the filing of this action have occurred, been performed, excused or otherwise waived.

## COUNT I
## Chapter 86, Fla. Stat. – Declaratory Judgment

83.     Plaintiff, Edward Madera, re-alleges and incorporates herein by reference all of his allegations in paragraphs 1-82 of this First Amended Complaint, as if fully set forth herein.

84.     BFBD's termination of Madera's Agreement was unjust and improper and a breach of the vague termination provisions of the Agreement.

85.     Madera has a bona fide, actual, present practical need for a Declaratory Judgment to determine his rights against BFBD's unjust and improper termination of his Agreement.

86.     Madera seeks a declaration that BFBD's termination of the Agreement was unjust and improper and in breach of the vague termination provisions of the Agreement and therefore invalid and of no consequence.

87.     Madera and BFBD have an actual, present, adverse and antagonistic interest in determining whether BFBD improperly terminated the Agreement.

88.     The antagonistic and adverse interest shall be present before the Court by proper process and the relief sought is not merely the giving of legal advice or questions propounded from curiosity.

WHEREFORE, Plaintiff, Edward Madera, prays for the entry of a Judgment declaring that Bimbo Foods Bakeries Distribution, LLC's termination of the Distribution Agreement, Exhibit "1" hereto was unjust and improper and in breach of the vague termination provisions of the Agreement and therefore invalid and without force or effect, and for such further relief as the Court deems just and proper.

### COUNT II
### Permanent Injunctive Relief

89.     Plaintiff, Edward Madera, re-alleges and incorporates herein by reference all of his allegations in paragraphs 1-82 of this First Amended Complaint, as if fully set forth herein.

90.     BFBD breached the Agreement by terminating it for reasons which are untrue and unjust and improper and in breach of the vague termination provisions of the Agreement.

91.     BFBD placed a substitute driver in Madera's territory during his period of termination from his distribution route and BFBD prevented Madera from continuing to service the stores and the customers in his territory.

92.     By preventing Madera from servicing his stores and his customers BFBD caused substantially more than mere monetary damages.

17

93.     Madera has spent approximately fourteen (14) years tirelessly working several hours a day in his territory cultivating personal relationships and goodwill with the managers and employees of his stores in his territory and his customers.

94.     As a result of his tireless efforts, Madera has achieved great shelf spacing, promotions and displays throughout the stores in his territory.

95.     Whenever BFBD has put in a substitute driver to operate a Distributor's territory and distribution business, the territory and the Distributor's distribution business suffers from poor service, and the stores and the customers will favor other Distributors.

96.     Evidence that Madera's territory and distribution business suffered due to Madera's termination from his territory and his distribution business is the fact that BFBD paid Madera significantly diminishing amounts of $1,016.62, $740.23, $86.70, $4,007.45 and $0.00 for four (4) weeks as the net proceeds during the eight (8) weeks when it over and operated his distribution business.

97.     Prior to BFBD's termination of Madera's Agreement, he was averaging weekly net sales revenues of approximately $2,000.00.

98.     It is critically important to preserving the relationships and goodwill built up by Madera that Madera be permitted to continue to operating his distribution business and that he be allowed to continue servicing the stores and the customers in his territory.

99.     Madera is in need of permanent injunctive relief restraining BFBD from preventing him from servicing the stores and the customers in his territory.

100.     Madera will suffer irreparable injury if the permanent injunction is not granted.

101.     There is no adequate remedy at law.

102.    Pursuant to the Agreement, Madera has a clear legal distribution right to service the stores and the customers in his territory.

103.    Madera has a substantial likelihood of success on the merits.

104.    It is in the public's interest to enforce lawfully binding contracts and to protect individual Distributors and small business owners like Madera from BFBD's unjust termination of its Agreement with Madera which impacts Madera significantly in terms of making a living operating his distribution business and to also require him to sell his distribution rights on short notice.

WHEREFORE, the Plaintiff, Edward Madera, prays for the entry of a permanent injunction after a trial on the merits, restraining Bimbo Foods Bakeries Distribution, LLC as follows:

(i)     Taking any action that would prevent or interfere with Madera operating his distribution business with BFBD pursuant to the parties' Distribution Agreement;

(ii)    Failing to sell fresh baked good to Madera;

(iii)   Failing to credit Madera with returns of damaged, stale, and over code products;

(iv)    Selling or attempting to sell baked goods directly to Madera's customers in his territory;

(v)     Delivering or attempting to deliver BFBD's baked goods directly to Madera's customers in his territory;

    (vi)    Charging or attempting to charge Madera for BFBD's operation of his distribution business in his territory for the period that he was terminated from the territory;

    (vii)    Communicating to Madera's customers that he is no longer BFBD's Distributor for its products;

    (viii)    Communicating to Madera's customers or to any third party that his business or territory is or will be for sale;

    (ix)    Forcing or attempting to force Madera to sell his territory and/or his distribution business; and,

    (x)    Such other injunctive relief that the Court deems just and proper.

**COUNT III**
**Breach of Contract**

105.    Plaintiff, Edward Madera, re-alleges and incorporates herein by reference all of his allegations in paragraphs 1-82 of this First Amended Complaint, as if fully set forth herein.

106.    BFBD improperly terminated the Agreement.

107.    BFBD's improper termination of the Agreement is a breach of the Agreement.

108.    As a direct and proximate result of BFBD's breach of the Agreement, Madera has suffered and he will continue to suffer damages.

WHEREFORE, Edward Madera, respectfully prays for the entry of a judgment in his favor and against Bimbo Bakeries Food Distribution, LLC for damages, interest and costs, and for such further relief as the Court deems just and proper.

## COUNT IV
### Breach of Covenant of Good Faith and Fair Dealing

109.  Plaintiff, Edward Madera, re-alleges and incorporates herein by reference all of his allegations in paragraphs 1-82 of this First Amended Complaint, as if fully set forth herein.

110.  Inherent in the Distribution Agreement between BFBD and Madera is the duty and covenant of good faith and fair dealing in terms of the parties' dealings with each other as to the performance of the Agreement and as to the termination of the Agreement.

111.  BFBD is in breach of its covenant of good faith and fair dealing as to Madera as follows:  (a) by BFBD's, by and through its Sales Representative London, unjust and improper termination of Madera's Agreement and his distribution rights; (b) by BFBD's failure to abide by the terms of the Agreement in terms of allowing for curable breaches and serving proper notice pursuant to the Agreement; (c) by BFBD attempting to buy back and to take back a Publix grocery store from Madera's exclusive territory and by retaliating against Madera when he refused BFBD's offer to buy back the store; and, (d) by failing to provide Madera with any specific details and by unilaterally changing and charging Madera for cost items and BFBD's promotions that he has not agreed to from the weekly settlement of his account which is how Madera earns his income from owning and operating his distribution business.

112.  As a direct and proximate result of BFBD's breach of its duty and covenant of good faith and fair dealing as to Madera, Madera has suffered damages and he will continue to suffer damages.

113.  BFBD's breach of its duty and covenant of good faith and fair dealing as to Madera, demonstrates willful misconduct, malice, wantonness, or an entire want of care, which raises the presumption of conscious indifference to consequences, and such actions were done with the specific intent to cause harm to Madera thereby entitling Madera to an award of punitive

damages in order to penalize, punish and deter BFBD from continuing or repeating their unlawful conduct.

WHEREFORE, Edward Madera, respectfully prays for the entry of a judgment in his favor and against Bimbo Bakeries Food Distribution, LLC for damages, interest and costs, and for such further relief as the Court deems just and proper.  In addition, Madera reserves the right to seek punitive damages against BFBD for this Count of this action and Madera intends to seek leave of this Court under Section 768.72, Florida Statutes to pursue the punitive damages.

**COUNT V**
**Violation of Florida's Unfair and Deceptive Trade Practices Act**
**(Section 501.201 *et seq.*, Florida Statues)**

114.    Plaintiff, Edward Madera, re-alleges and incorporates herein by reference all of his allegations in paragraphs 1-82 of this First Amended Complaint, as if fully set forth herein.

115.    This is an action against BFBD for violation of Florida's Unfair and Deceptive Trade Practices Act, Section 501.201 *et seq.*, Florida Statutes.

116.    Madera developed the territory of his delivery business and he created a demand for BFBD's products that were supplied to him by BFBD.

117.    By reason of the service provided, money expended and efforts made, Madera established and developed a profitable distribution business and he attracted and held many steady and satisfied customers, establishing substantial and valuable goodwill, which benefited himself and BFBD.

118.    Under the terms of the Distribution Agreement, Madera's distribution rights could not be terminated unless Madera had repeated failures of performance that constitute chronic failure of performance and that threaten substantial harm to BFBD's business as delineated in the Agreement.

119.     Madera has at all times duly performed all conditions and terms on his part to be performed under the Distribution Agreement.

120.     No good cause exists or existed for the termination of Madera's Agreement and his distribution business as initiated and carried out by London on behalf of BFBD and BFBD acted unjustly and improperly and it did not follow the vague termination terms of the Agreement in terminating Madera's Agreement.

121.     BFBD's termination of Madera's Agreement and thereby his distribution business was arbitrary, wrongful, and in breach of the vague termination terms of the Distribution Agreement between Madera and BFBD.

122.     BFBD is in violation of § 501.204(1), <u>Florida</u> <u>Statutes</u> as follows: (a) by BFBD's, by and through its Sales Representative London, unjust and improper termination of Madera's Agreement and his distribution rights; (b) by BFBD's failure to abide by the terms of the Agreement in terms of allowing for curable breaches and serving proper notice pursuant to the Agreement; (c) by BFBD attempting to buy back and to take back a Publix grocery store from Madera's exclusive territory and by retaliating against Madera when he refused BFBD's offer to buy back the store; and, (d) by failing to provide Madera with any specific details and by unilaterally changing and charging Madera for cost items and BFBD's promotions that he has not agreed to from the weekly settlement of his account which is how Madera earns his income from owning and operating his distribution business.

123.     By BFBD's wrongful, unjust and improper termination of his Agreement, Madera has suffered a loss of income for the period of time that he was terminated from his route from January 20, 2015, through March 24 2015, that he had derived from his distribution business for

the last fourteen (14) years and he was faced with a complete loss of his distribution business due to being forced by BFBD to sell his business.

124.    BFBD is in violation of § 501.204(1), Florida Statutes by its wrongful, unjust and improper termination of his Agreement which has caused Madera to suffer a loss of income that he has derived from his distribution business for the last fourteen (14) years and he was faced with a complete loss of his distribution business due to being forced by BFBD to sell his business.

125.    BFBD's actions constitute unconscionable, unfair and deceptive trade practices in violation of Florida's Unfair and Deceptive Trade Practices Act, § 501.201 *et seq*., Florida Statutes.

126.    BFBD's actions and conduct caused and they will continue to cause irreparable harm to Madera, who has no adequate remedy at law.

127.    As a direct and proximate result of BFBD's wrongful actions described herein, Madera has sustained actual damages as described above, and Madera will continue to accrue and sustain such damages in the future on an ongoing and continuing basis.

WHEREFORE, Edward Madera, respectfully prays for the entry of a judgment in his favor and against Bimbo Bakeries Food Distribution, LLC for his actual and compensatory and other damages contemplated by and available through the Unfair and Deceptive Trade Practices Act, in § 502.201 *et seq*., Florida Statutes; injunctive relief; an award of the costs of suit and reasonable attorney's fees; and such other relief as the Court deem just and proper.

## COUNT VI
## Misappropriation/Wrongful Termination of
## Madera's Territory and Distribution Rights

128.    Plaintiff, Edward Madera, re-alleges and incorporates herein by reference all of his allegations in paragraphs 1-82 of this First Amended Complaint, as if fully set forth herein.

129.    This Count of this action is for BFBD's wrongful, unjust and improper actions to misappropriate and wrongfully take Madera's property, namely his territory and distribution rights under his Agreement that he purchased over fourteen (14) years ago in order to own and operate a distribution business for the distribution of BFBD's products within an exclusive territory.

130.    At all times material hereto, all rights, title, and interests in Madera's distribution rights in his territory and in his distribution business belonged to and resided with Madera.

131.    By its action of wrongfully terminating Madera's Agreement, BFBD misappropriated and wrongfully took Madera's property, namely Madera's income that he derived from his distribution business and his distribution rights and his territory and his distribution business.

132.    BFBD's misappropriation and wrongful taking of Madera's distribution rights and his territory and his distribution business constituted a knowing, unlawful and intentional taking and conversion of Madera's property for BFBD's economic benefit and to the economic detriment of Madera.

133.    As a direct and proximate result of BFBD's misappropriation and wrongful taking of Madera's distribution rights and his territory and his distribution business, Madera has sustained damages, including actual and compensatory damages.

134.    BFBD's misappropriation and wrongful taking of Madera's distribution rights and his territory and his distribution business, demonstrates willful misconduct, malice, wantonness, or an entire want of care, which raises the presumption of conscious indifference to consequences, and such actions were done with the specific intent to cause harm to Madera thereby entitling Madera to an award of punitive damages in order to penalize, punish and deter BFBD from continuing or repeating its unlawful conduct.

WHEREFORE, Edward Madera, respectfully prays for the entry of a judgment in his favor and against Bimbo Bakeries Food Distribution, LLC for his actual and compensatory and other damages, interest and costs, and for such further relief as the Court deems just and proper. In addition, Madera reserves the right to seek punitive damages against BFBD for this Count of this action and Madera intends to seek leave of this Court under Section 768.72, Florida Statutes to pursue the punitive damages.

## COUNT VII
## Negligent Supervision

135.    Plaintiff, Edward Madera, re-alleges and incorporates herein by reference all of his allegations in paragraphs 1-82 of this First Amended Complaint, as if fully set forth herein.

136.    This Count of this action is for BFBD's negligent supervision of London, its Sales Representative and Regional Manager in Central Florida, who wrongfully terminated Madera's Agreement and who directed the overcharging of BFBD's costs that it charged to Madera during the period that BFBD operated Madera's route while he was terminated from the route in order to engage in unfair and abusive business practices as to Madera and the other Distributors of BFBD products in Florida.

137.    BFBD has a duty to properly supervise London in order to know or to attempt to know about the management and business practices of London and in order to avoid any unfair

26

or abusive treatment by London of Madera and the other Distributors of BFBD's products who purchase, own and operate distribution businesses to distribute BFBD's products.

138.   BFBD has breached its duty of properly supervising London and it has negligently supervised London, its Sales Representative and Regional Manager in charge of its Sanford, Florida distribution warehouse, by allowing London to engage in repeated unfair and abusive treatment of Madera and the other Distributors of BFBD's products who purchase, own and operate distribution businesses to distribute BFBD's products.

139.   BFBD has breached its duty of properly supervising London and it has negligently supervised London, its Sales Representative and Regional Manager in charge of its Sanford, Florida distribution warehouse, by allowing London to wrongfully terminate Madera's Agreement and to thereby terminate Madera's distribution business that Madera purchased, owned and operated in Florida for the past fourteen (14) years and by allowing BFBD, at the direction of London to overcharge Madera for BFBD's costs that it charged to Madera during the period that BFBD operated Madera's route while he was terminated from the route.

140.   As a direct and proximate result of BFBD's negligent supervision of London, Madera has sustained damages, including actual and compensatory damages, and Madera will continue to accrue and sustain such damages in the future on an ongoing and continuing basis.

141.   BFBD's negligent supervision of London demonstrates willful misconduct, malice, wantonness, or an entire want of care, which raises the presumption of conscious indifference to consequences, and such actions were done with the specific intent to cause harm to Madera thereby entitling Madera to an award of punitive damages in order to penalize, punish and deter BFBD from continuing or repeating its unlawful conduct.

WHEREFORE, Edward Madera, respectfully prays for the entry of a judgment in his favor and against Bimbo Bakeries Food Distribution, LLC for his actual and compensatory and other damages, interest and costs, and for such further relief as the Court deems just and proper. In addition, Madera reserves the right to seek punitive damages against BFBD for this Count of this action and Madera intends to seek leave of this Court under Section 768.72, Florida Statutes to pursue the punitive damages.

### COUNT VIII
### Violation of 26 U.S.C. § 7434 – Civil damages for fraudulent filing of information returns

### (Against Defendant Bimbo Foods Bakeries Distribution, Inc. ("BFBD, Inc.") Only)

142.   Plaintiff, Edward Madera, re-alleges and incorporates herein by reference his allegations in paragraphs 1-18 of this First Amended Complaint, as if fully set forth herein.

143.   This Count of Madera's First Amended Complaint is brought on his behalf against Defendant, Bimbo Foods Bakeries Distribution, Inc., ("BFBD, Inc.") to obtain damages as allowed by § 7434 of the Internal Revenue Code (26 U.S.C. § 7434), arising out of BFBD, Inc.'s willful filing of fraudulent information returns, specifically IRS Forms 1099-MISC, with respect to payments that were falsely reported to have been made to Madera.

144.   26 U.S.C. § 7434 provides a private right of action for damages[1] on behalf of Madera for the willful filing of fraudulent information returns with the Internal Revenue Service (IRS). Forms 1099-MISC are "information returns" within the meaning of § 7434.

---

[1] 26 U.S.C. § 7434. entitled, "Civil damages for fraudulent filing of information returns" provides, in part, as follows:

    (a) In general.  If any person willfully files a fraudulent information return with respect to payments purported to be made to any other person, such other person may bring a civil action for damages against the person so filing such return.

    (b) Damages.  In any action brought under subsection (a), upon a finding of liability on the part of the defendant, the defendant shall be liable to the plaintiff in an amount equal to the greater of $5,000 or the sum of –

145.    BFBD, Inc. is a seller and distributor of fresh baked bread, rolls, cakes, buns muffins and related products.

146.    BFBD, Inc. operates throughout the United States and it distributes its products to grocery stores and other retailers through what it terms "Independent Operators." ("Independent Operators" or "I/Os").

147.    As a condition for delivering BFBD, Inc.'s baked goods, each I/O is required to purchase "distribution rights" for delivery to stores located in a certain geographical area contained within each sales route.

148.    Plaintiff, Edward Madera, has purchased a sales route and the exclusive right to distribute products of BFBD, Inc. in a specific geographic area.   As such, Plaintiff is an "Independent Operator".

149.    BFBD, Inc. takes the position that the Plaintiff, Edward Madera, is an independent contractor, and, as such, each year it files with the Internal Revenue Service ("IRS") the informational return IRS Form 1099-MISC for Plaintiff, Edward Madera.

150.    Plaintiff, Edward Madera, alleges that BFBD, Inc. willfully filed fraudulent Forms 1099-MISC with the Internal Revenue Service reporting to the IRS incorrect amounts that were allegedly paid by BFBD, Inc. to Plaintiff, Edward Madera.

151.    Plaintiff, Edward Madera, alleges that BFBD, Inc. willfully filed fraudulent Forms 1099-MISC with the Internal Revenue Service with an intent to deceive and in order to advance BFBD, Inc.'s own interests.

---

(1)   any actual damages sustained by the plaintiff as a proximate result of the filing of the fraudulent information return (including any costs attributable to resolving deficiencies asserted as a result of such filing),
(2)   the costs of the action, and
(3)   in the court's discretion, reasonable attorney's fees.

152.    Each year that Plaintiff, Edward Madera, has been affiliated with BFBD, Inc., as an "Independent Operator", BFBD, Inc. has filed a Form 1099-MISC with the IRS and reported that BFBD, Inc. paid to Plaintiff, Edward Madera, "Nonemployee Compensation" in an amount that is far in excess of the actual amount that was actually paid to him.

153.    The specific misrepresentations by BFBD, Inc. to the IRS of the amounts of "Nonemployee Compensation" that it paid to Plaintiff, Edward Madera, for the last six years of 2014, 2013, 2012, 2011, 2010 and 2009, which is the six (6) year statute of limitations period under 26 U.S.C. §7434, are as follows:

a.    For the tax year 2014, the 1099-MISC filed by BFBD, Inc. represented that it had paid Plaintiff, Edward Madera, "Nonemployee compensation" in the amount of $883,291.05.  (Please see Exhibit "2").  However, the amount that BFBD, Inc. actually paid Plaintiff, Edward Madera, in 2014 was only $98,479.29.  (Please see Exhibit "3" – Net payable to I/O $98,479.29).

b.    For the tax year 2013, the 1099-MISC filed by BFBD, Inc. represented that it had paid Plaintiff, Edward Madera, "Nonemployee compensation" in the amount of $841,121.80.  (Please see Composite Exhibit "8").  However, the amount that BFBD, Inc. actually paid Plaintiff, Edward Madera, in 2013 was only $92,250.65. (Please see Composite Exhibit "9" – Net payable to I/O $92,250.65).

c.    For the tax year 2012, the 1099-MISC filed by BFBD, Inc. represented that it had paid Plaintiff, Edward Madera, "Nonemployee compensation" in the amount of $890.826.93.  (Please see Composite Exhibit "8").  However, the amount that BFBD, Inc. actually paid Plaintiff, Edward Madera, in 2012 was only $100,654.77. (Please see Composite Exhibit "9" – Net payable to I/O $100,654.77).

d.      For the tax year 2011, the 1099-MISC filed by BFBD, Inc. represented that BFBD, Inc. had paid Plaintiff, Edward Madera, "Nonemployee compensation" in the amount of $823,055.00.  (Mr. Madera is missing his 1099 for 2011).  However, the amount that BFBD, Inc. actually paid Plaintiff, Edward Madera in 2011 was only $97,816.24. (Please see Composite Exhibit "9" – Net payable to I/O $97,816.24).

e.      For the tax year 2010, the 1099-MISC filed by Defendant, BFBD, Inc. represented that it had paid Plaintiff, Edward Madera, "Nonemployee compensation" in the amount of $745,317.27.  (Please see Composite Exhibit "8").  However, the amount that BFBD, Inc. actually paid Plaintiff, Edward Madera, in 2010 was only $63,669.88. (Please see Composite Exhibit "9" – Net payable to I/O $63,669.88).

f.      For the tax year 2009, the 1099-MISC filed by BFBD, Inc. represented that it had paid Plaintiff, Edward Madera, "Nonemployee compensation" in the amount of $500,570.34.  (Please see Composite Exhibit "8").  However, the amount that BFBD, Inc. actually paid Plaintiff, Edward Madera, in 2009 was only $92,350.92. (Please see Composite Exhibit "9" – Net payable to I/O $92,350.92).

154.    The total amount of "Non-Employee Compensation" that BFBD, Inc. over-reported to the IRS, in which it represented that it had actually paid Plaintiff, Edward Madera, but had not, for the last six (6) calendar years totals $4,138,960.60.  The amount reported by BFBD, Inc. to the IRS on behalf of Plaintiff, Edward Madera, totals $4,684,192.30 and the amount actually paid by BFBD, Inc. to Plaintiff, Edward Madera, totals $545,221.75.

155.    The above-referenced inflated, false amounts that BFBD, Inc. reported to the IRS as "Nonemployee Compensation" actually paid to Plaintiff, Edward Madera, included amounts that represented BFBD, Inc.'s costs of goods sold, as well as advertising, marketing and

promotional expenses. These amounts were never actually paid by BFBD, Inc. to Plaintiff, Edward Madera.

156.    At all times relevant hereto, BFBD, Inc. knew that the above referenced Forms 1099 that it issued to Plaintiff, Edward Madera, were false as the Forms 1099 did not reflect the amounts of "Nonemployee Compensation" that BFBD, Inc. actually paid to Plaintiff, Edward Madera.

157.    BFBD, Inc. intentionally issued the above referenced inaccurate Forms 1099-MISC in bad faith and in order to willfully mislead, conceal, and deceive Plaintiff, Edward Madera, as to the amounts of nonemployee compensation that he actually made and received from BFBD, Inc. as an Independent Operator affiliated with the company.

158.    BFBD, Inc. intentionally issued the above referenced inaccurate Forms 1099-MISC in bad faith and in order to willfully mislead, conceal and deceive Plaintiff, Edward Madera, as to amounts that BFBD, Inc. was paying and/or not paying to him as part of his purported nonemployee compensation for his distribution of the BFBD, Inc.'s products relating to BFBD, Inc.'s promotions that BFBD, Inc. extended to its customers.

159.    BFBD, Inc. intentionally issued the above referenced inaccurate Forms 1099-MISC in order to receive tax related benefits resulting from the reporting of the costs of goods sold including BFBD, Inc.'s promotions of its products as the nonemployee compensation of its "Independent Operators", including Plaintiff, Edward Madera.

160.    The above-referenced Forms 1099 were filed willfully by BFBD, Inc. and they contain fraudulent information because the amounts reported to the IRS are not the actual amounts that BFBD, Inc. paid to Plaintiff, Edward Madera, as his nonemployee compensation as discussed above.

161.    26 U.S.C. § 7434 provides that a person who is the subject of a fraudulent information return that has been willfully filed by another may bring a civil action for damages against the person who willfully files the fraudulent informational.

162.    The damages allowed by 26 U.S.C. § 7434 are an amount equal to the greater of $5,000 or the sum of: (1) any actual damages sustained by the plaintiff as a proximate result of the filing of the fraudulent information return (including any costs attributable to resolving deficiencies asserted as a result of such filing); (2) the costs of the action; and, (3) reasonable attorneys' fees, in the Court's discretion.

163.    Each year, Plaintiff, Edward Madera, deducts on his IRS tax returns the difference of what BFBD, Inc. represents as his "Nonemployee Compensation" on his Form-1099-MISC and the sum of what was actually paid by BFBD, Inc. to him either by check or direct-deposit.

164.    Plaintiff, Edward Madera, has not suffered any actual damages as a result of BFBD, Inc.'s filing of the fraudulent Forms 1099-MISC other than any additional costs associated with the preparation of his IRS tax returns showing the above referenced deductions which amount to less than $5,000.00.

165.    Because Plaintiff, Edward Madera, has not suffered any actual damages as a result of BFBD, Inc.'s filing of the fraudulent informational returns other than any additional costs associated with the preparation of his IRS tax returns showing the above referenced deductions which amount to less than $5,000.00, he is entitled to an award of $5,000.00 for each violation of BFBD, Inc.'s violation of 26 U.S.C. § 7434 for the last six (6) calendar years which is the statute of limitations period for claims under said statute.

WHEREFORE, Plaintiff, Edward Madera, seeks the following relief against Defendant, Bimbo Foods Bakeries Distribution, Inc.:  (1) a finding that the Forms 1099s filed by BFBD, Inc.

between the years 2009 and 2014 were willfully filed by BFBD, Inc. and were fraudulent; (2) a finding that the correct amount of payment for each Form 1099-MISC filed by BFBD, Inc. for Plaintiff, Edward Madera, between the years 2009 and 2014 is the amount actually paid by BFBD, Inc. to Plaintiff, Edward Madera, by check or direct deposit; (3) an award in the amount of $5,000.00 to Plaintiff, Edward Madera, for each fraudulent Form 1099-MISC willfully filed by BFBD, Inc. on behalf of Plaintiff, Edward Madera; (4) an award to Plaintiff, Edward Madera, of his reasonable attorney's fees and costs; and, (5) an award of other and further relief as this Court may deem appropriate.

## **Demand for Jury Trial**

The Plaintiff, Edward Madera, demands trial by jury on all issues so triable.

DATED this 17th day of June, 2015.

Respectfully submitted,

*/s/John Finnigan*
John Finnigan
Florida Bar No.:  0972363
FINNIGAN LAW FIRM, P.A.
1700 Maitland Avenue
Maitland, Florida 32751
Telephone: (407) 478-3700
Facsimile:  (407) 478-6999
Email: John@Finniganlaw.com
Counsel for Plaintiff

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on June 17, 2015, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:  Michael L. Gore, Esquire and Arnold L. Berman, Esquire, Shutts & Bowen LLP, 300 South Orange Avenue, Suite 1000, Orlando, Florida 32801.

*/s/John Finnigan*
John Finnigan